In the Matter of the Petition of TREMONT HOUSING CORPORATION, Petitioner, to Register the Title to Certain Lands against MARION DE VRIES, INC., Respondent.*

Supreme Court, Suffolk County, March 18, 1929.

*Affd. on opinion below, 229 App. Div. 739.

*Walter Fairchild*, for the petitioner.

*Samuel J. Rawak*, for the respondent.

THOMAS, Official Referee. As early as 1740 a large tract of wild and wooded land in the county of Suffolk was held in common proprietorship, and allotments thenceforth were made from time to time, and in the third division in April and May, 1793, allotments were made that now give rise to the present contention, which relates to the division line between land allotted to Philip Smith Platt, and land allotted to Isaac Powell lying immediately southerly of it. The sole question is: Where is that division line located? The *locus in quo* was overgrown and hidden by pine and brush that trammelled in obscurities and entanglements survey and identification, save that at present, and for some years, there has been clearing of lands far to the east now occupied by the nuns of St. Dominic or the convent.

The proprietors appointed a surveyor and associates to make the allotments, who not only prepared a map of the allotments, known as a map of the Baiting Place Purchase, Third Division, herein referred to as the map of 1793, but also recorded descriptions and notes of survey in a book still preserved and known herein as the "notes." The Tremont Housing Corporation, petitioning to register title of a part of the Powell tract, refers to the map of 1793 as an "outline sketch" and the Marion De Vries, Incorporated, respondent, resisting the application regards the map of 1793 as a "picture." But it should be kept steadily in view (1) that the map and notes constitute the instrument of grant; (2) that they are products of technical engineering skill, and practical knowledge gained by laying out the many separate parcels and defining their relations to each other and to the whole section. Therefore, departure from their terms is tolerable only in instances where

boundary line and measurements are so inconsistent that one or the other must yield something to perfect or to approximate the identity of the grant.

Hence it is to the notes (Exhibit 9) and map (Exhibit 7, copy Exhibit 13) of 1793 that attention is primarily due, and it is by them with relevant aids, such as measurements on the ground, that the rights of the parties should be determined. The Baiting Place Purchase, Third Division, shows many tracts allotted with several exterior or boundary roads of the Third Division, and some portion of a division (the Second) on the west, and some portion of a division (the Fourth) on the east. The westerly boundary of the Third Division in question is the two-rod highway which forms a southerly junction with the Bethpage road (known also as the Great Neck road), which last road runs from the junction southeasterly to make a junction with a road unnamed on the maps (now known as the Albany Avenue road), which is depicted as running in a general northeasterly direction, and making a junction with a road known as the new highway, which was not existing in 1793, save in its northerly portion then terminated some three miles north of the appointed junction. But the continuation of this new highway with its courses and distances was clearly noted on the 1793 map and the entire road then so in part built was fully delineated on the map. It also should be stated that from the Second Division (west of the Third Division) a road is shown entering the Third Division and running southeasterly across it, which was plainly marked " Seketogue Path." That path is not identified, but its coincidence with the later constructed Babylon and Farmingdale road, which succeeded to its general location and took over its uses, is asserted by the respondent and denied by the petitioner. For present purposes, it may be conceived that there are three sections of the Third Division, viz., the western section, containing lots bounded on the two-rod road; the eastern section, bounded easterly on the new highway, and north of the east and west line which running between the parties hereto extend across the whole division, and the third section which lies southerly of that line and abutting on the Bethpage road, or Albany avenue. Each allotment carries folio references to the 1793 notes, states usually the acreage, in some instances the course or distances. The allotments in question illustrate the detail of the map and notes. The respondent's predecessor allottee appears on the map as " Phillip Smith Platt;" the acreage as fifty-eight; the easterly boundary as fifty-four (rods meaning); the westerly boundary the two-rod road and the Bethpage road, and the notes refer to it at " Folio 13 " where it is described: " in ye westermost tier of lots bounded West by a two rod highway which

divides it from ye land laid out to Cornelius Heartt on ye Second division * * * by ye Bethpage road running from thence East about 168 rods then ye course of ye highway 54 rods on a square then West 168 rods to ye Sd highway and down ye same to ye place of beginning See ye General Map laid out by us."

The map shows that the petitioner's allottee, Isaac Powell, is allotted a triangular piece of land, the northerly line of which is the east and west division line between Powell and Platt, the south-easterly line as 120 rods on the Bethpage road and terminating northwesterly at some distance from the junction of the Bethpage and the two-rod road, and terminating southeasterly in a line running from the Bethpage road " N 31 E " to the east and west line. This third boundary line of Powell separates his allotment from that of Rubin Ketcham. The Powell allotment is noted as containing twenty-two and one-half acres, and there is a reference to " Folio 17 " wherein the description is as follows: " Laid out to Isaac Powell a piece of land Northward of ye land laid to Rubin Ketcham & Smith Conkling 120 rods on ye bethpage road then east till it meets ye afore Sd containing 22½ acres laid out by us NB there is a watering place throne out of this lot and not recorded in ye 22½ acres. The Sd watering place is 12 rods one way & 20 ye other."

The petitioner proposed to oust the respondent's land from the access to, or boundary on, the Bethpage road, accorded to it by map and notes of 1793, and from all access to, or boundary on, the two-rod road for several hundred feet above its junction with the Bethpage road, and petitioner proposes in addition to add to its land, that is, the Powell tract, what it would take from the respondent, although the map and notes of 1793 gave Powell no position on the two-rod road, and an occupation on the Bethpage road apparently some hundreds of feet southeasterly of its junction with the two-rod road. Such capture by the petitioner would result in an increase of the acreage of the Powell tract from the appointed twenty-two and one-half acres to an amount hereafter discussed.

The history the petitioner presents to justify this apparent nullification or transposition of the boundary lines indicated by the map and notes of 1793 relieves it of the charge of bad faith, and indicates that its claim conforms to beliefs and opinions largely entertained for many years by some allottees and surveyors, especially those interested in allotments in the eastern part of the Third Division of the Baiting Place Purchase, where there was more use of the allotments. The map and notes of 1793 intended that what is the division line between Platt and Powell should be a part of an east and west line with a westerly terminal in the Bethpage road

and an easterly terminal in or near the junction of the new highway, when actually laid down, as directed, and the Albany avenue highway. But the new highway extension was not laid out on the ground until some fifty, may be sixty, not to exceed seventy-five years ago, which was at least sixty years after the map and notes of 1793 were made and the generation or generations concerned in making the allotments had passed away, and this Third Division of the Baiting Place Purchase was an unused, marketless region submerged in the pines and thickets that now in the main overlay it. And since the easterly junction of the two roads was actually made, the generation contemporaneous with it has passed away. Solomon Ketcham, past his eighty-seventh year, a descendant of the Solomon Ketcham (whose name appears as an allottee) was a witness herein. This last Solomon Ketcham died after his examination, but his brother, William J., aged eighty-two years, had memory of some relevant conditions and happenings many years distant. I refer to these men because their longevities, retained faculties, intelligence and probity especially commend them for oral testimony, although other men of accepted credibility testified of periods somewhat later.

Many maps, some of the general region, some of parts of it, have been introduced. There are two to which there will be later reference, one made by Widmayer, deceased, whereon secondary to the allotments the petitioner's title rests, and one by Jervis, born in 1852, the oldest living surveyor of the region, and of such obvious integrity and intimate association with that community as to render his relation of its pertinent history and his professional work concerning it of peculiar value. To Widmayer and Jervis I shall later return. The knowledge 'and judgment of men who have adopted the east and west line located practically as petitioner proposes it was based initially upon the belief that the junction of the new highway and Albany avenue, as it is now laid on the ground, is the junction defined by the map and notes. But it is not the junction foretold by the courses and distances prescribed on the map of 1793, nor is it possible for it to be the easterly terminal without totally disregarding the westerly terminal declared by the map and notes of 1793, and without extravagant elongation of the division lines between properties. A survey shows that the junction of the new highway and Albany avenue could not be where it is, if the prescribed courses and distances, written on the map of 1793, be observed. The learned counsel for the petitioner accounts for the apparent disagreement by magnetic deviation or local or other influences for which allowances being made, he contends the junction is shown to be properly located. But it is reasonable to conclude that the disagreement with the prescribed courses and

distances cannot be thus harmonized, for this east and west line is a straight line and its westerly end must be in the Bethpage road. But it is carried, if drawn through the easterly junction of the easterly road as now laid on the ground, several hundred feet north, thereby driving the Platt land off the Bethpage road and a considerable part of its boundary on the two-rod road, and canceling the very language of the notes of the allotment to Platt, and providing a westerly rest for the Powell lot on the two-rod road of which there is not only no suggestion but rather definite confinements of it to the Bethpage road at a considerable distance from the two-rod road. A line ending in the Bethpage road on the west and the junction on the east as it exists on the ground would not be a straight line nor could it in any wise answer to the east and west line provided in the allotment. It would be distorted and distort the boundaries of all tracts abutting on it. If, now, finding the easterly junction located at a place disagreeing with the prescribed courses and distances and its westerly terminal where the allotments definitely forbid it to be, thereby setting awry the given distances of the division lines, it is neither reasonable nor just to let the error longer mislead and the truth be sacrificed. At least the present parties should not be victims of it. The truth observed now will not affect the holdings east of the Platt and Powell pieces. What the owners of such easterly allotments have done would remain undisturbed by decision herein, but now what belonged to Platt and what to Powell is the sole consideration, and what the map and notes of 1793 determined as a reality should not be abrogated for the unworthy purpose of preserving consistency with an old error. The adoption of petitioner's proposed line, marked " C-C " on Exhibit X, would make queer prolongation of the division lines in the allotments to the east and west of the two-rod road, south of the east and west line. The Bethpage road was a base line, and from it ascended division lines to the east and west line for which search is now made. These division lines were the legs of the east and west line. If now, the line " C-C " be adopted, these division lines or legs must be stretched northward several hundred feet. Take the division lines between the land allotted to Rubin Ketcham and Smith Conkling, and the land allotted to Joshua and Phillip Ketcham. By the map and notes of 1793 this line is marked 160 rods, that is, 2,640 feet, but Jervis admits that in his Parkwood map he made the south line over 3,100 feet from Bethpage road, and according to respondent's survey the prolongation is 836.15 feet beyond the 2,640 feet, or 3,476.15 feet in all. But if this 160-rod line be prolonged, every other division line south of the east and west line must be lengthened — lengthened not to harmonize the boundary lines but to distort them.

The petitioner's title is traced through tax sales based on and limited by the Widmayer map of 1874, which is evidence of the true position of the east and west line, and condemns the line "C-C," and the prolongation of lines above mentioned. The petitioner would meet this evidence by urging that the land west and the land east of the Bethpage road, on the Widmayer map, are not shown in their proper relation. But the map shows due articulation in form, and the arrangement seems consistent generally with the respondent's contention. The petitioner would swing the two-rod road to the westward so as to make its junction with the Bethpage road several hundred feet northerly of its present junction, thereby allowing petitioner's proposed lines "C-C" to meet the Bethpage road very near the junction thus imagined. This suggestion is based on the use of a scale of the 1793 map applied to the respondent's map, Exhibit X., which is, of course, not allowable. The respondent shows the two-rod road making its junction with Bethpage or Great Neck road at the proper point. The scale of the map of 1793 is not known.

The petitioner urges that the respondent's survey has misplaced the watering place that is shown on the east and west line of the map of 1793. The watering place on that map is shown as covering a part of the Platt, Powell and Rubin Ketcham allotments, and with Powell's easterly line ending at its center, and the notes of 1793 describe a watering place corresponding to it as excepted from the Powell acreage, and, therefore, inferentially in the allotment. The watering place seems to have disappeared in evaporation, and its location or extent become uncertain and ambulatory. According to the testimony of the engineers of the parties, in the wilderness of trees and brush a depression is found that gives the surveyors the impression of an extinct and ancient water hole, and respondent's surveyor places it wholly within the Platt tract, and petitioner's surveyor gives it variable locations which do not conform or conform wholly to the allotment. An evaporating and now evaporated water hole is not an abiding monument and its obscured or lost location so diversely asserted by the surveyors should not control marks of certainty; such as the Bethpage road and the two-rod road.

The Seketogue path was an important land mark on the 1793 map but its identity has been lost as its purpose and approximate location have been superseded or taken over by the Babylon and Farmingdale highway. The respondent makes this highway coincident with the Seketogue path, but that is exposed to grave doubt. The Seketogue path was not a northeasterly corner of the Isaac Brush lot, for the Walter's allotment just north of Brush included all of the path, for as the notes of the Walter's lot state the Walter's

lot was on " both sides " of the path. The petitioner increases the lack of confidence in the Seketogue path's true position, even strengthening his own contention by computations based upon the present highway, the path and the Brush northeast corner. After long study of the history of this region as presented by the parties and the abundance of painstaking considerations presented by them, there is at least one certainty that leads the mind towards a just conclusion. As already discussed, the petitioner would by his proposed line, started at any erroneous easterly terminal according to the notes prescribing the courses and distances of the new highway, expel Platt from the Bethpage road and some of the two-rod road, and take them over for boundaries, and for this end would prolong division lines. But nothing can disturb the Bethpage road as the base line from which rises the boundaries between Powell and Rubin Ketcham, and the latter and Smith Conkling, and the latter and Joshua and Phillip Ketcham. So one is on solid ground, if he begins with the division line between the land allotted to Ketcham and Conkling and that allotted to Joshua and Phillip Ketcham, which is marked " N 31 E 160 r." The location of this line is a certainty established with the assent of the engineers of both parties. If the line be kept in mind as a determined starting point, ascertainment progresses for a time. The 1793 map and notes give this line, its length and course, and its place on the ground is known. The allotment to Joshua and Phillip Ketcham states that it runs 160 rods " to an east and west line." The petitioner states that such east and west line is the line C-C. But that line is so far northerly that it would extend the 160 rods line by some 811 feet, and would extend also all other division lines as heretofore discussed. Moreover, the forthstanding fact is that as between these parties the east and west line must be such a line as will give Platt boundary on both the two-rod road and the Bethpage road, that is, the east and west line must terminate in the Bethpage road, and also must be such as to shut off the Powell piece from any boundary on the two-rod road, and keep such boundary as Powell has on the Bethpage road southeasterly of its junction with the two-rod road. But the line C-C to which petitioner would carry the Conkling-Joshua and Phillip Ketcham 160-rod division line, violates what is given to Platt, and aggrandizes with no semblance of authority what is given to Powell. Therefore, the east and west line must pass through the 160-rod division line at its northerly end and proceeding due west come to the Bethpage road. But to what point in that road? Must it be at such point as will permit a line on the Bethpage road 120 rods long to be laid between its terminal and Rubin Ketcham's west line? The notes are: " Laid

out to Isaac Powell a piece of land Northward of ye land laid to Rubin Ketcham & Smith Conkling 120 rods on ye Bethpage road then east till it meets ye afore Sd land then So 31 W till it meets ye afore Sd road containing 22½ acres laid out by us." The water hole is then excepted. But if there is laid off 645.09 feet from the terminal of the eastermost line in the Bethpage road to its junction with the two-rod road, then 120 rods, or 1,980 feet, to Powell, there is a collision with the line of Rubin Ketcham and Smith Conkling on the Bethpage road, which is 91 rods or 100 rods according to the different interpretations. Adopting Abel Ketcham's 1828 survey which pushed Rubin Ketcham's west westward would, to allow 120 rods, carry the westward terminal of line "A-A" 251 feet to the westward and raise the line " A-A" northward 173 feet, reducing respondent on Bethpage road to 394. Measuring from the Powell east line as it was before the Ketcham survey, the shortage of 120 rods line would be 110 feet, which would raise line "A-A" 76 feet. But this can be done only by recasting the basic figures and positions of lines as shown on the map and notes of 1793. It would do the following to the 1793 map: (1) Push northward on the map the junction of the new highway and Albany avenue; (2) lengthen the division lines that run to the east and west line as boundaries for Joshua and Phillip Ketcham, Smith Conkling, Rubin Ketcham and Isaac Powell; (3) carry the western terminal of the east and west line northward; (4) enlarge the acreage of every tract laid out south of the east and west line. That is what the petitioner has done by proposing the line C-C, which carries farther northward the 160-rod line 831.15 feet, and other division lines in proportion. If, now, the east and west line is the line A-A ending in the Bethpage road 645.09 feet from its junction with the two-rod road and it is the division line between the Platt and Powell tracts, the purpose of this hearing has been ascertained. It gives the Powell tract twenty-four and six-tenths acres instead of twenty-two and one-half acres demanded by the allotment; it gives the Powell piece a base on the Bethpage road, although it reduces its length from 120 to 105 or 113½ rods as heretofore explained. But the Powell 120 rods on the Bethpage road begin at Rubin Ketcham's west line and run northwesterly to a point on the Bethpage road and then run back again as a part of the main east and west line to Rubin Ketcham's same west line from which it started, intersecting it this time at its northerly terminal, and this line thus becomes the Powell third line. If the Powell second line be misplaced by raising it towards the north and also be lengthened, and the third line be lengthened, Powell's first line can be lengthened to 120 rods. That would make two lines well established servient to the petitioner's

first · line. I have emphasized the necessity of keeping in strict adherence to the line between Conkling and Phillip and Joshua Ketcham as it appears and is described. It is at least the one thing absolutely anchored beyond disturbance. The notes and map give it courses and distances, and the east and west line by the map and notes (notes, p. 98) meet it at its northerly terminal, and comes to Rubin Ketcham's and Smith Conkling's land to " run west along the same," and then Powell and Platt take it and use it, one for a north line, and one for a south line, and both for a .division line. All the other north and south division lines conform to this 160-rod line, at the northern terminal of which runs the east and west line.

Thus the whole third section of the map is standardized and structured. But the Powell line on the Bethpage road cannot be lengthened to 120 rods without deciding that all the other lines are wrong and the Powell Bethpage line is alone correct. Beginning at the 160-rod division line between Rubin Ketcham and Conkling and Phillip and Joshua Ketcham there must be an allowance of proper dimensions for Rubin Ketcham and Conkling. The map and notes give the distances along the east and west line at 104 rods and along Bethpage road at 100. But it seems uncontradicted that such dimensions cannot co-exist, and that if the north line be 104 rods the south line must be 91 rods, or if the south line be kept at 100 rods as marked on the map, the north line must be $113\frac{1}{2}$ rods.

The present disproportion was discovered as early as 1828 when Abel Ketcham, a surveyor, made a survey and ascribed to the Ketcham and Conkling lot a northern boundary of $113\frac{1}{2}$ rods, and a southern boundary of 100 rods, and so partitioned the interests of Rubin Ketcham and Smith Conkling, giving the former twenty-five acres and the latter fifty acres. But to do this he°was obliged to push Rubin Ketcham's west line (which was Powell's east line) 8 rods to the westward, but its actual measurement before this was $113\frac{1}{2}$ rods, which after the 1828 survey became 105 rods. Taking the Powell east line at the point on Exhibit X noted " westerly boundary of Rubin Ketcham as indicated on original map of Darrynane " and measuring 120 rods northwesterly along Bethpage road the northerly terminal would be 250 feet north of A-A. There are other points of starting the measurement that would make a different shortage.

The Widmayer map indicates Widmayer's conclusions as to lines, of what probative force as interpreting the original grant I shall not discuss, but it is determinative of the petitioner's title, and it brought no more than it proffers. It prohibits the location of the line " C-C " and the allowance to Powell of 120 rods on the

Bethpage road. It is enough to say regarding the Widmayer map that all of the land shown on it easterly of the Bethpage road both in length and height lies within the line A-A and the Bethpage road as respondent claims it was shown on Exhibit X. To lengthen the Powell line on the Bethpage road would dispute petitioner's grant based on the Widmayer map's dimensions; to increase the distance northerly beyond the line A-A would do the same. The Widmayer east and west line, which is twenty-five feet at the westerly end, and some ten feet at the easterly end, south of A-A, estops such claim by petitioner.

The proposed line " C-C " would grossly swell the petitioner's acreage. There is surplus acreage which in large part petitioner places south of its line " C-C," while respondent accumulates it south of the south line of Amityville, formerly known as the Bon Seignor tract, on the map of 1793 appearing as the tract of Willet Powell and part of tract awarded to the Six Powells.

When the Bon Seignor or Amityville tract was, in registration proceedings, adjudged the land of the present petitioner, the present respondent was made a party and the Bon Seignor south line was adjudged to be where it is shown on Exhibit X. As to Bon Seignor, that decree estopped respondent, but did not compel it to accept title to the land south of the south line there decreed. For some 679 feet south of that line is a tract to which neither party has title, and neither claims it, except that the respondent contends that an intermediate deed, if the dimensions be computed, gives it sixty-three acres instead of fifty-eight as the allotment of 1793 shows, in which case the respondent's north line would absorb some five acres of this surplus land. The fifty-eight acres as allotted to Platt are 54 rods, or 891 feet, and measured from line A-A would end at a line drawn east and west through a point marked "(63)" on the tracing of Exhibit X. By respondent's deeds indicating measurements of sixty-three acres the line would be at 65. Accordingly there is 679 feet, running southerly from Bon Seignor's south line, to point "(63)," or some 479 feet running to " 65 " to which neither party has title. The respondent's attempt to place this surplus land south of " C-C " and absorb what it may by elongating the north and south divisions lines, the 160-rod line some 861 feet, is not sustained. If the respondent took this land just southerly of the Bon Seignor south line, it would have in all some ninety-two (plus) acres, but as it is, it would have fifty-two or sixty-three acres, accordingly as the allotment or later deed is followed. If petitioner's line " C-C " be adopted, the Powell tract would have instead of the twenty-two and one-half acres stated in the allotment, sixty-two and eight-tenths acres as measured by respondent or forty-

two and five-tenths acres as measured by petitioner. If the line A-A be adopted, the Powell tract would measure twenty-four and six-tenths acres, and such line affects the acreage of all properties on the Bethpage road with moderation, which the line " C-C " would not. Indeed the line A-A in my judgment should be adopted and the line " C-C " rejected for the following reasons:

(1) Because the junction of the new highway and Albany avenue is not where the note on the map of 1793 directed it to be.

(2) A line drawn through the present eastern junction would not end in the Bethpage road.

(3) A line drawn through the present eastern junction would take from Platt what the map and notes of 1793 gave him on the Bethpage road, and some part of that allotted him on the two-rod road.

(4) The petitioner's line " C-C " would give it all the Bethpage road from Rubin Ketcham's west line to the junction, and 237.73 feet on the two-rod road, which the allotment forbids.

(5) The line " C-C " would necessitate carrying the tracts abutting on the Bethpage road several hundred feet northward, thereby elongating the 160 rods north and south division line 861 (plus) feet and other division lines in proportion, in utter defiance of the notes and map of 1793, and total disarrangement of the plans and framework of those who made the allotments.

(6) The land east of the Bethpage road laid out on Widmayer's map is contained within the east and west line A-A, the Bethpage road, and Rubin Ketcham's east line, and petitioner's title based on the Widmayer map cannot exceed what it delineates.

(7) The line " C-C " would increase petitioner's acreage from twenty-two and one-half to forty-two and five-tenths, as petitioner computes it, or sixty-two and eight-tenths as respondent gives it. This of itself begets suspicion of the validity of petitioner's claim.

The history seems to be that the map and notes of 1793 promised an easterly junction for an easterly starting point, and when one appeared at a time now ancient, those interested and surveyors adopted it, as Sammis, Jervis predecessor's surveyor did, and Jervis did, influenced by Sammis, and others did likewise, and stakes and stones appeared on an east and west line, and when the west terminal was reached that was taken to be the true western terminal in total disregard of what the map and notes of 1793 directed. Jervis entirely sincere and of large employment in the Baiting Place purchase, read no deeds save the allotments and condemned the western terminal commanded by them, but reaching a point " C " of " C-C " turned northward and thence arose Parkwood, as constituting the Platt allotment.

But by no possible conception could all of Parkwood be the Smith

Platt grant, without doing violence to the allotments of Platt and Powell. And so in time Widmayer was called in by an owner of Darrynane (Powell tract) and he located it where it and the Platt pieces would answer completely to the allotments, except Powell's full 120 rods on the Bethpage road, and an easterly terminal at the junction of the eastern roads, and by this map practically coinciding with A-A the petitioner's land was sold and bought. What it gives petitioner got — aught else is denied it. Happily the east and west line it indicates is in harmony with the title of Platt and Powell, and every foot that east and west line is carried northward is in disagreement with Widmayer's map and the general layout of tracts resting on the Bethpage road. Thereby respondent gets slightly less acreage than the allotment named, petitioner gets slightly more than the allotment gave Powell, but he would by the line " C-C " get nearly twice as much or three times as much accordingly as petitioner's or respondent's engineer is correct.

It would be an easy disposition of this controversy to let the long time and customary use of the present easterly junction rule the decision, and that respondent must take Parkwood with its fifty acres thereby thrusting Platt tract off Bethpage road, and giving all south of respondent so located to petitioner with its gross increment of acreage. That would make mischief with the titles of both parties. In this hearing respondent disclaims all title or interest in Parkwood, assuming it to be the place south of Bon Seignor, save that respondent's north line runs to the point (63) or (65) which may fall within Parkwood.

The registration proceedings affecting Bon Seignor do not give respondent title to land lying immediately south of it, or compel it to trade a true location for a wrong one. If De Vries or any owner of the Platt tract fell into the common error as to the location of the east and west line, there is no estoppel as between the present parties.